for the appellate. Thank you. Number 20-51 79 Gulf Restoration Network et al. Debra A. Haaland in her official capacity as secretary of the interior et al. Ms. Hardy for the appellants. Mr. Heminger for the appellates. Ms. Hardy, you may proceed. Good morning. May it please the court. I'm Brittany Hardy for the conservation group appellants. I'd like to reserve two minutes for rebuttal. The environmental impact statement that we've challenged is the last chance for the Bureau of Ocean Energy Management to evaluate the environmental effects of offering millions of acres of public land for oil and gas development. And it's important that the agency gets it right. It matters. Here the Bureau didn't get it right. Instead, the EIS for the two lease sales contains false assumptions that misled the public about the true risks of the sale. I'd like to talk about three stark errors with the agency's analysis that warrant vacature. First, the Bureau skewed its analysis about whether to hold these lease sales and instead treated the decision as a foregone conclusion. Second, the Bureau relied on the existence of brand-new safety regulations to conclude that another catastrophic spill wouldn't happen when it was well aware that Interior was in the process of dismantling those same regulations. And third, the Bureau promised commenters that it would analyze substantial enforcement shortcomings that the agency had identified. But in its analysis, it didn't even consider those gaps. So turning to the first claim, which is the Bureau's skewed no action alternative. Here the agency improperly assumed that the effects of the proposed lease sale would happen eventually, whether or not they decided to hold those sales. And that completely skewed the agency's analysis of benefits and costs and affected its decision, led to a statutory decision. I was confused as to why in your brief you didn't cite to or focus on the Interior's assessment of a no action alternative in the programmatic EIS. You didn't see that in your brief, and I'm just wondering why that is. Well, the no action alternative from the programmatic analysis can't substitute for the decision that the agency was making at this stage, the lease sale stage. So at the programmatic level, the agency was deciding whether or not to hold lease sales at all. And that's a different decision when you get to year two or three and you're deciding whether to hold an individual lease sale. To give a practical example, it's if the first EIS assesses the broader question, why can't the second EIS zoom in and focus on the marginal effect of the two lease sales directly at issue at the later stage? Well, first the second EIS didn't zoom in. The second EIS didn't look at the question of whether to hold those lease sales. It assumed that the lease sales would happen eventually. Later lease sales would make up for those effects. But it assumed that in the context of the programmatic EIS and the evaluation that the agency had made that they were going to make a certain number of lease sales during this five year period. It assumed that in context, it wasn't in the air that they thought, okay, if this lease sale doesn't happen, another one will because that determination was made at the programmatic stage. So I'm curious as Judge Katsas is, as to why you didn't really assess the fact or challenge the fact that the programmatic EIS did the assessment of no action, meaning no lease sales during this period of time. Well, the question is different at the lease sale stage. So it's important to understand at the programmatic level, they set a schedule to hold 10 lease sales and if they don't hold these two lease sales, that means there will be eight lease sales instead of 10. It doesn't mean that those lease sales will happen later. It means there will be a lower number of lease sales. And that matters because if there are less lease sales. I don't understand. The initial stage is where they say we're going to hold 10 lease sales. So when they get to the later stage and they're assessing a particular lease sale, why is it unreasonable for them to say even if we don't do this one, that is the no action alternative in this context, there will be another one because we have previously determined that we're going to do 10 during this period of time. That's how I read these documents. You seem to suggest that they could say at the second stage, if we don't do these, we'll just have eight now. And I'm suggesting that they had previously said, no, no, we're going to have 10 regardless. Well, the fundamental, I guess what's important to understand here is that the programmatic stage, they did not commit to holding 10 lease sales. And the agency isn't arguing that it committed at that stage. The underlying statute, the Outer Continental Shelf Lands Act, doesn't require the agency to hold all the lease sales in its schedule. And in fact, in the past, the agency is not as committed to holding all the scheduled lease sales. So the programmatic level is just setting a tentative schedule. It's not committing to those lease sales. At the lease sales stage, and if you look at the purpose that they articulate in the lease sale EIS, the purpose of that process was to decide specifically whether and how to hold these lease sales. And so the question of whether to hold this lease sale was made, the question of whether or not to  and the answer to that was to hold it at the lease sale stage. And that's at JA859. So just to give a practical example, if you were looking at your retirement investments and you decided I'm going to sell 10% of my investments once a month for the next 10 months, and then you moved forward January and February, sold 10% of your investments. March, you said I want to relook at this decision and decide whether to sell 10% of my investments. The decision at that stage is much different than deciding whether to sell all of your assets writ large. It's a question of whether to sell your assets in that month, and you couldn't just assume that you would double up and sell 20% of your assets in April, because that's a different decision-making process. You may decide to do that, or it's equally as likely that you may not double up and you may not sell any assets in April. But the agency here improperly assumed that all the effects from selling eight lease sales would be exactly the same as if they had sold 10. In the interest of time, you may want to move on to your second and third arguments. Sure. In terms of the safety regulations, I want to step back and just put this in context. We had the Deepwater Horizon spill just a little over a year ago, a little over a decade ago, and now the Bureau is saying that everything is fine, all the problems have been fixed, so we don't need to worry about going full steam ahead with oil and gas production, but the record tells a different story. Interior was dismantling important safety regulations, and evidence shows that reforms hadn't been ---- I think the problem I see with that argument is that at the time, those regulations had not been amended, and so I don't see how you can have an agency in EIS assume that regulations are going to be changed when they haven't been changed yet. And then further, the changes that were made didn't completely dismantle them. They changed some of the requirements, but they weren't  I'm more interested in your argument about if you're going to be able to get enforcement assumptions, given the results of the commission that examined the Deepwater Horizons bill and the GAO findings. Sure. Yeah, so to answer your questions about the safety rules, NEPA requires agencies to look at impacts of the EIS. It requires agencies to look at impacts at the earliest possible time, and these rule repeals were well underway by the time the agency completed its EIS. The administration had issued two executive orders directing Interior to dismantle these rules. The Secretary of Interior had also issued an administrative order telling the agencies to do the same, and days after the agency completed its EIS, NEPA was able to dismantle these rules in the federal register. So this was not a crystal ball inquiry. This was information that was available to the agency, and it's important to remember that in the environmental impact statement, the agency gave false information. It told the public that these rules were not changing. At the very least, it needed to acknowledge that these changes were underway, and it relied on these rules specifically to dismantle the EIS.    It told the public that these rules were not changing. Which is the very key. Ms. Hardy, didn't it rely on other things as well so that even if we agree with you that these two rules were under revision, that it was clear as to how they were being revised, that they were being revised, and the agency should not be reliant on the EIS, but also a statistical analysis and other safety regulations in making its determination that a catastrophic oil spill was unlikely. So what do we do with that if there is, say, a problem with their reliance on one aspect of the record, but there are other things in the record to support the conclusion? The agency relied primarily on these safety rule changes, particularly the well control rules. So at JA369, the agency said a catastrophic spill is not expected, partly given the extremely low probability, the quantitative analysis, but more importantly, as a result of the reforms put in place after deep water horizon. And the agency considered, goes on to say that these reforms would help ensure that the U.S. can safely and responsibly expand development. The agency also specifically said at JA1018, finalization of the well control rule was expected to decrease the probability of deep water blowouts. So the agency considered these reforms to be the most important part of its conclusion that a catastrophic spill wouldn't happen. And turning to the judge Wilkinson's question about the substance of the repeals, the Interior Department was removing critical requirements. For example, the agency was removing requirements to close a blowout preventer seal at all times. And removing requirements to ensure that the seal closes properly. And the blowout preventer remembers the equipment that failed during deep water horizon. The revisions also eliminated standards for third parties inspectors to remain independent. And that was something the deep water horizon commission identified as critical. So these were not minor changes. These were removing important requirements that were needed to address deep water horizon. When the agency was putting these rules into place, too, the agency stated in the proposed rules that one consistent element in the deep water horizon investigations was that additional requirements related to blowout preventers and well control equipment are needed. And a primary purpose of the well control rule was to do those things. And that's at 81 Fed Reg 21508 and 25890. I can turn to the safety enforcement claim, Judge Wilkinson, that you alluded to in the GAO report briefly. In the GAO report, the GAO reported substantial failings with the safety division of interiors enforcement and inspection program. And the bureau in its environmental impact statement when it was doing the programmatic EIS recognized that the GAO report was a critical issue and told the public it would address those shortcomings and any planned reforms in the lease sale EISs. Then when it got to the lease sale EIS stage, the agency changed its story. It said that the GAO report was outside the scope of leasing and to direct any questions to the safety division, another agency. So and then in its brief, the agency's counsel changed its story again saying that what it meant in the programmatic EIS was that the agency was going to address these findings at a later stage. But that's not what the agency said in the EIS. And the agency, this court shouldn't attribute arguments from the agency's counsel that the agency itself hasn't made. Also that argument doesn't hold water. The lease sale is thus the critical stage. As this court has held, it's the stage of no go, no go. So it was critical for the agency to address these shortcomings now. And as this court has found in Delaware department of natural resources, it's insufficient for an agency in responding to comments to push the issue off to another agency. It must meaningfully respond to  Otherwise the ‑‑ I'm wondering whether the GAO report though is really all that damning. I mean, is it something that we need to be concerned that the agency didn't adequately take into account because it might actually change its view of how things are going or should be going in this situation? It was somewhat critical of the safety agency, but was that enough to undermine the agency's conclusion that there will be enforcement of these safety protocols in a way that would mitigate environmental impacts? The GAO report identified  These weren't just minor problems. So if you look at the appendix, the GAO concluded that the safety division, it terms it with the acronym BESSI, BESSI's deficient oversight capabilities continue to undermine its ability to effectively oversee offshore oil and gas operations. And at JA438, the GAO found that the safety division had in fact  post‑deep water horizon concerns. So what it found was that the seven years after the deep water horizon spill, the Bureau still had not corrected gaping holes in their regulatory enforcement and made the reforms that were needed. These were big problems that needed to be addressed. And remember, the Bureau itself recognized that these were problems it needed to address, but then failed to do so. In the interest of time here, let's suppose for the sake of time, we agree with you on one or more of those claims. Why is vacature appropriate here given the arguments made by the EPA and interveners? The presumption in this circuit is that if an agency makes an arbitrary decision, this court should vacate that decision. This is not the rare case where the court should remand without vacature because here the errors the agency made were serious. They go to the heart of NEPA. What the agency did was undermine public disclosure, which is a fundamental requirement of NEPA. And it undermined decision making. One of the most important questions in a NEPA process is whether or not to take the proposed action. Remember, too, that this was ‑‑ You don't disagree that you're not saying that in every NEPA case there should be a different rule. You have to vacate in the case, but in other APA cases you can remand without vacature. You're not saying that, are you? No. I'm saying that the ordinary remedy for an arbitrary decision is to vacate that decision, and the court has discretion to depart from that ordinary remedy in rare cases, but it must balance the seriousness of the agency's errors with any disruptive consequences if it is going to exercise its discretion to depart from that ordinary remedy. Here the errors are serious, so they don't warrant remand without vacature, and keep in mind, too, this is not a decision to build a highway. This is a massive decision about whether to open all available land in the Gulf of Mexico to oil and gas leasing, and these errors go to the heart of these operations. After Deepwater Horizon there couldn't be a more important issue to get right than whether or not there should be a catastrophic spill and all the devastating consequences expected. It's important for the agency to look at that risk and evaluate those impacts in full before it makes its decision, and here the agency didn't do so, so it's important for the court to vacate this decision so they can start from a clean slate and get it right. What of the economic impacts that interveners and EPA identify in the disruption? The disruptive consequences here are limited. This court has held that disruptive consequences alone, first of all, shouldn't be a basis for declining to vacate. They have to be considered in the context of the errors that were made. Here the only information that we have about economic disruption is that the oil companies have made payments to buy leases and rental payments. We don't have any specific evidence of reliance that the industry has placed on these leases or drilling that has started or expenses related to drilling, so we're really just talking about refunding money here. The intervener says we have to, you know, if the leases were in effect vacated and then they had to be bid out again, we're in a situation where now the public knows, you know, what the winning bids were, and so you can't really kind of put the toothpaste back in the tube and have the same sort of bidding process. Well, the industry, first of all, placed its bids with knowledge that these lease sales were under challenge. The result, too, is not that these companies can't bid in the future. If the bureau decides to reopen this lease sale, the companies are able to bid. They may have to pay slightly higher prices, but that competition happens all the time in this area. That's a minor effect compared to the bigger NEPA errors that are at stake here and the importance of getting this analysis right. Thank you. Judge Jackson, Judge Katsas, do you have any other questions at this time? No, thank you. All right. Counsel, you're over time, but we'll give you some time-worn rebuttal. Let's hear from counsel for the department, Secretary Holland, Mr. Hemminger. Good morning, Judge Wilkins, and Justin Hemminger for the Department of Interior and federal appellees. Before deciding to hold two lease sales in the Gulf of Mexico in 2018, Interior's scientific and technical experts did an extensive and deep dive into the potential environmental impacts that would come from leasing, and it documented those potential effects in three-tiered environmental impact statements. Because Interior's analysis complies with NEPA, this court should affirm the district court's judgment. I'd like to cover each of the topics that we've heard today, starting with the no-action alternative, addressing the safety rules, also addressing the safety agency's role in enforcement, and finally addressing remedy. So turning first to the no-action alternative, I think it's helpful to take a step back and orient the court to the statutory program here. This is under the Outer Continental Shelf Lands Act. OCSLA has a four-step process that it applies for leasing, but the express policy that Congress has established here is to make the shelf's resources available for expeditious and orderly development. Subject to environmental safeguards, keeping in mind the nation's interests. So at the first stage, Interior is setting up a five-year plan for leasing decisions. That plan is not, in fact, a commitment, which I think was one of the court's questions. It is a plan. So it is a schedule of proposed leases, but it doesn't mean that Interior is, in fact, going to do each of those leases exactly the same when it comes time for those leases. Sorry, Mr. Heminger. Does it mean that it will do those leases, though? I mean, the most interesting part of Ms. Hardy's argument from my perspective is the revelation that even though the plan said 10 leases, she indicates that that doesn't mean that the agency will ultimately have 10 leases during that timeframe. Is she wrong about that? I agree, actually. I agree with the appellant's counsel. She's correct. The fact that there is a schedule of 10 leases does not mean that Interior is going to do each of those leases. So the decision at the five-year stage is to plan. So to be clear, what Interior cannot do is after scheduling, and here it was 10 lease sales over a five-year period, Interior can't then add an 11th sale to that five-year period. So it can't expand or go outside the scope of that five-year plan, but within the five-year plan, decisions about how many leases and what those leases look like are made at the second stage. Okay. So she says at the second stage now, you've gotten there, you have these two leases, and to the extent that you are required to assess a no-action alternative, why is it enough to essentially say, well, if we don't do these two leases, we're going to do other leases per our original plan? So I think there are two things that are important to understand here. First, it is still relevant that at the first stage Interior did look at the no leasing in the Gulf no-action alternative. That no-action alternative is relevant because Interior tiered to and incorporated that same no-action alternative when it reached the leasing stage. So at the second stage, Interior didn't ignore the alternative of no leasing at all in the Gulf of Mexico. It just said we've done that analysis, we've incorporated that by reference into this analysis at the second stage. But I hear Ms. Hardy saying it's actually a different analysis at the second level. It is. Okay. So I would agree. Yes. So again, it's sort of a pyramid process. And so you're filtering down, and I think Judge Katz has referred to this as zooming in. So at the second stage, when you zoom in to the lease sale stage, what Interior is looking at is the proposed action, the proposed decision to do a single lease sale. That's the question that Interior is looking at. And so what it needs to determine is what are the environmental impacts of either doing a single lease sale, canceling that lease sale, or in fact doing something that's in between those two options. All options are on the table. Interior has the full menu of options in terms of how much leasing it does at that lease sale stage. All right. So looking at the no-action, cancel that lease sale, what are the relevant criteria, and does it make sense for them to say something about, well, this is going to happen anyway? Yes. So here's where I think the plaintiffs are simply incorrect and wrong about what Interior's analysis shows. We're looking at two different categories of effects. NEPA says you look at the direct and indirect impacts of the proposed action. That's the primary analysis. But the second thing you look at is cumulative impacts. And cumulative impacts are what happens from other actions that are not the action that you're actually looking at, proposed action. So what Interior does at the second stage, and this is documented in two EISs, it's the multi-sale EIS and the supplemental EIS, what it says is, look, the effects of the direct and indirect impacts of holding a sale are a comparison between a solution alternative and holding that sale. But let's look over here at what's going on in the OCSLA program as a whole. This is a program that Interior has administered for decades. It has a five-year plan in place. It expects to do more five-year plans in the future. What are the cumulative impacts, the effects of leasing that has happened, that is ongoing, and that will happen in the future? Those cumulative effects are what Interior refers to when it says, cancel one sale. That doesn't change the overall impacts, the cumulative effects of what is going to be happening, what has happened, what is happening, and what will happen, reasonably foreseeable in the future. Those cumulative impacts are what we expect to happen. That's a reasonable judgment. It's a prediction by Interior based on its experience and its deep knowledge of leasing and its administration of a program that Congress put in place decades ago. Doesn't it presuppose that when you do the broad assessment at the early stage, let's just say it's 10 versus zero, and you get your plan and you say we think we'll do 10, I understand there's no final commitment finding legal obligation to do all 10, but isn't there some understanding that that's what you're intending to do, likely to do, presuming to do? Because if not, then I don't understand why at the second stage you wouldn't have the 10 versus eight question be answered, and the no action alternative would be that there are two leases before us. We're not committed to doing anything else, so we have to assess 10 versus eight. No, that's exactly right, Judge Katsas. There is a plan here to do 10 lease sales. The final decision to do those, whether to do each of those sales happens at the point of the sale. Okay. But keep in mind, this is a program, Congress put this program in place, and the program is to do expeditious and orderly development of the shelf, and so what Interior is looking at, and the cumulative impact analysis, the best place to see that is at JA 939 to 942 and JA 950 to 951, but Interior talks about how it's looking at energy demand, it's looking at the OXLA program, and it's forecasting based on its experience with leasing in the Gulf of Mexico for many decades, it's forecasting that it's reasonably predictable that leasing will continue into the future, and plaintiffs call that a false assumption, but that's based on Interior's expertise. It's based on its judgment, and this court's decision in Village of Bensonville VFA says when you're defining a baseline and then you're looking at the way to predict the future, when you're defining a baseline, it's really an expert judgment by the agency. So in light of the plan. Correct. Correct. Can you speak to the other two issues? I'm mindful of your time. Yes. Judge Jackson, so on the safety regulations, I wanted to highlight the point that you had asked counsel for the appellants, which is Interior's primary conclusion here about the risk of a catastrophic oil spill is based on a technical and statistical analysis that it did, and that is in the program EIS. The joint appendix sites are JA289 to 291 and JA371. 289 to 291 and JA371. And Interior's conclusion from that, so that analysis in that risk assessment is based on data that comes from 1964 to 2014. So it includes data that preexisting the Deepwater Horizon disaster, and it doesn't include or account for the 2016 safety rules that are at issue here. But Interior's conclusion from that data-driven analysis is the risk of a catastrophic spill is very low. In fact, it's so low that it's not a reasonably foreseeable result or occurrence in the context of these lease sales. So that's Interior's conclusion, and that's the basis, the record evidence that supports that conclusion. Plaintiffs simply overlook that and focus on the 2016 rules. What is your argument about the rules? Because I guess I'm a little concerned about the suggestion that if the agency is in any way relying on rules that are under construction, so to speak, that it has flagged as being subject to amendment, that the proposed amendments are out there, that we according to Ms. Hardy have executive orders saying we're going to change these particular rules. I guess I'm concerned about the suggestion that the agency doesn't have to take that into account if it relies on those rules when it's putting together an EIS. So is that your position? Are you taking the sort of hard line, unless the rule is in effect, we don't have to look at it? No, Your Honor, and I don't think the court has to draw a bright line test here based on legal effect. I think that's a relevant consideration. Are these rules that are in effect? Because as we all know, a proposed rule can change, so there's not ‑‑ there is a certain amount of uncertainty there, but I don't think you have to agree that that somehow releases the agency from any obligation to consider the issue. I think more importantly here, the plaintiffs are really exaggerating the amount of reliance that Interior was placing on these 2016 rules. So plaintiffs try to suggest that the 2016 rules encapsulate all of what Interior was relying on in deciding that the risk of a catastrophic spill was very low. Here's my problem with your argument, counsel, is that there was a catastrophic spill in 2010. So who cares about the statistics? We just had one. And we had a report by the commission that focused in on that catastrophic spill and said that one of the key reasons it happened was because of lack of enforcement and basically agencies not really taking their NEPA obligations seriously. And then rule changes are promulgated in response to that to try to keep it from happening again. And then you're going to argue to me that undoing those rule changes is kind of a nothing burger and a GAO report that says that the agency isn't really effectively enforcing the old regulations, let alone any new regulations and procedures, is really something that should just, you know, not really take any serious role here in the EIS after we've had a catastrophic spill that did devastating damage to the environment and decimated lots of livelihoods from people who make their living on the Gulf. You're really going to make that argument this morning? No, I wouldn't, your honor. I wouldn't dare to. And I would say Interior took Interior's reforms after the deep water horizon disaster, and it talks about this throughout these EISs, Interior undertook the most serious reform in the department's history, and those reforms are not solely the 2016 rules. Those reforms covered many other areas and other rules, and we've I think at JA245 to 246, Interior had laid out a listing of the comprehensive reforms that it included, and one of those reforms is the well control rule, and Interior certainly saw that rule as an important safety measure but to be clear, we're also not arguing that we also completely disagree with the notion that Interior repealed or dismantled the 2016 rule, safety rules. As Interior explained in several places, it made targeted amendments, revisions to those two rules. It didn't dismantle them or as the plaintiff's saying, repeal them. Those rules, the substance, the nature of those rules and the environmental safeguards, the important environmental safeguards that those rules provided are still in place, and that's reflected in Interior's analysis at joint appendix 1058 to 1064. That's a fact sheet going over the revisions to the well control rule, and then to the extent, so this issue, Interior did acquire more information later in the NEPA process. Why wasn't it addressed really head on and in a straightforward way in the supplemental EIS? So what Interior said there was rely on enforcement to say, well, you know, we're not going to have any catastrophic failures, and then you're going to rely on that but you're not going to address head on the systemic failures at enforcement and why your reliance is justified given that. And you're talking about the GAO report, your honor? The GAO report and for that matter what the Deepwater Horizon Commission reporting found. So on the amendments Interior did do, so Interior said in the supplemental EIS, we don't have, we're relying on the information that we have now, and these proposed rules aren't, to amend the 2016 rules aren't in place. Later in the process, toward the end of the process, Interior said we have more information. So it gave another look at the amendments to the 2016 safety rules in response to a letter from plaintiffs, from one of the plaintiffs and said we'll take another look at this for NEPA purposes, but their conclusion was that it didn't, the amendments to the 2016 safety rules didn't substantially change the environment, didn't impose any significant environmental impacts. That's at GA 1072 to 1076. So that was, so it, sorry, your honor. What about enforcement issues? So on enforcement, so Interior did consider and address the safety agency's role. The safety agency's role, this is BSEE, B-S-E-E is the acronym for the agency, but the safety agency's role doesn't occur, doesn't kick in until the third and fourth stages of the leasing process, but Interior did analyze the safety agency's role at this leasing stage in these EISs, and Interior's conclusion, and this is at GA 1022, is that the safety agency did have a rigorous inspection program. So in the, so certainly the GAO report says that there is work to be done. That's what the district court found, that there is work to be done. There are specific areas where GAO, which is a government auditing agency, identified areas for improvement that the agency needed to focus on, the safety agency needed to focus on, but I think the report, plaintiffs suggest that the report shows that the agency can't do any enforcement or that it's incapable of effectively enforcing the law. None of these EISs engages with that report. Right? The first EIS says we'll deal with it later, and I'm sorry, I have forgotten if it's the second or the third, but the later one says this is outside the scope of our inquiry at this stage. That's correct, John. If there's a concern about systematic failures in an agency, that's just as relevant to the global decision, the ten versus zero decision as it is to whenever it is you come to the point of making a final decision on any individual lease. I would agree with that, your honor, and there's some tension between what interior says as you point out in the five-year program EIS and what it said in the supplemental EIS. Interior said we'll take a look at this, and then when it reached the supplemental EIS, it said that it's outside the scope. I guess what I would say is the interior's NEPA obligations, so interior involves a lot of line drawing, and at some point you can't, the agency can't analyze every single element of every single decision that it's making and it has to decide where to draw the line. It decided to draw the line at we know that the agency is going to enforce the law, and we can also assume that when we put conditions on leases, when we ---- yeah, it's a question of degree, and normally you would just invoke the presumption of regularity and move on if you address it at all, but I mean this does seem like a pretty significant concern that's been raised, and, you know, there's always a question of line drawing about you have to resolve, you have to respond to major concerns but not every little tiny concern. This seems like it's closer to major. So I agree it's a question of degree, and if, you know, you have to look at how, you can read the GAO report several ways, so I would point to counsel for plaintiffs pointing to several pages. I'd point to GA 433 to 435 as pages where the agency says, look, excuse me, where GAO says that the safety agency has made progress. It has taken steps to address some of our prior concerns, but it has more work to do. So it is a question of degree, and I think in these circumstances the agency is entitled to deference on its judgment that this is where we know that this is their judgment that this is not, this is outside the scope of their analysis. Yeah, except, I mean, you have a somewhat stronger case if they had said we've looked at this, it's a question of degree, the agency is making progress. Now, that's a different case from what we have, which is the agency saying, oh, we're just not going to tell you, we're not going to say anything about the report and the progress or lack of it. I would agree with that. I would go back, though, to the basis for interior's conclusions that the environmental impacts here would be negligible to minor. That's the ultimate question here. What are the environmental impacts from leasing? Wasn't one of those conclusions that the safety agency would be enforcing these requirements? I mean, that's my concern with the safety agency point is that it appeared that from the beginning the agency itself was invoking in many different places the safety agency and its role and what it would do in coming to the determination that we're not going to have serious environmental impacts. So then when the critique comes, yes, but look at this report, it seems incumbent upon the agency if for no other reason than its initial reliance on the safety agency to engage with it, as Judge Katz says. So I'm a little concerned about this. And then might you also speak to if it turns out that the court finds that this aspect or any other is a reversible error and that the agency does have to go back and address this, what do you say about Baikonur or not under these circumstances? Well, I think the agency did talk about the role of both the safety agency and BOEM, the other agency, in future lease sales stages. And certainly those are an important role. But the agency also was looking at what it requires within lease sales and within permits and plans, and that is stipulations and conditions of approval that tell the leaseholders, that tell the companies what they can and can't do. And part of what Inter is doing here is reasonably relying on the fact that parties are going to comply with the requirements that are in their leases, that are in their plans and in their permits. Certainly the safety agency plays a role in backstopping and enforcing and overseeing that. But the starting point for Inter's conclusion was we're requiring mitigation. The mitigation is by the companies. And that mitigation is going to go a long way towards ensuring that leasing is done in a safe and environmentally sound way. And Judge Jackson, turning to your question about remedy, if the court is concerned that the agency hasn't responded to the GAO report, I think that's the sort of, you know, area where the agency can provide more explanation if necessary. But that doesn't require, that's not the sort of serious error that requires you to go back to the beginning of the starting place and drawing board. The agency should have an opportunity to listen to this court's concerns and provide a better explanation and a better analysis of that specific issue. And in terms of the disruptive nature of vacater, so we agree that setting aside agency action is the ordinary remedy in an APA case. But under allied signal, you look at the disruptive consequences. And I think this court's decisions in Vecinos L. Bienestar and Oglala Sue are examples of cases where this court has looked at the regulated parties, here the leaseholders, their reliance interests, their economic interests. I would point to the declaration submitted by industry and relied on in their intervener brief at JA149 as providing evidence of the sorts of economic and reliance interests that warrant not vacating these decisions. We have done that, but we've also said that in a NEPA case kind of a remanding without vacature is pretty weak sauce. I mean, it pretty much kind of undermines if NEPA is only a procedural statute and it requires a hard look at issues before you make a decision. Then it seems to me that you really undermining the principles of NEPA and the statutory scheme and purpose if every time an agency fails to look at something that's not an ancillary issue. This is core. Like whether you're going to enforce the rules and regulations and policies and inspect properly is core to preventing a catastrophic spill. This isn't, you know, some ancillary issue. This goes to the heart of the decision and whether you should move forward. Shouldn't that be part of our analysis? I agree it should, your honor. The seriousness of the issue is important, and to be clear, Interior takes this court's views seriously, and if there is a defect in its NEPA analysis, then it will look take a hard look at we'll seriously study what the court has said and also take a hard look at the NEPA issue. I will point out that, again, contextually, Joint Appendix 122 Interior did say that the safety agency has a rigorous inspection program, so Interior's view was that the safety agency would do its job, and if the agency, if Interior thought that the safety agency was not going to enforce the law, it was not going to provide appropriate environmental safeguards as required by OCSLA, then Interior would have said so, but if there's more work to be done, then Interior will take a hard look at that, and I would say, you know, again, stepping back, we are looking at hundreds of pages of analysis on innumerable topics, three EISs, many years of studies, so to say that Interior has taken a hard look at the environmental impacts of leasing, and it did that before it made its decision. Judge Katz, Judge Jackson, any other questions? All set. All right. Thank you, counsel. We'll hear on rebuttal from Miss Hardy, and we'll give you two minutes. Thank you, your honor. I'd like to address each of the three issues briefly in turn, so turning to the skewed no action analysis, Mr. Heminger points to the cumulative impact analysis, and that is exactly the problem here. The agency actually didn't compare what would happen cumulatively over the next 50 years if it did not hold these two lease sales compared to the action alternatives, if it did. You can look at JA939, the agency says that if we don't hold the lease sale, it will be postponed, so a separate analysis of the cumulative effects under alternative E, which is the no action alternative, is not considered here. You can also look at JA239, which shows the cumulative impact analysis that the agency did, and it doesn't include the no action alternative. It also shows the differences in production over the next 50 years if you vary a lease sale by size, so if you offer all of the golf golf, production is going to be substantially different over the next 50 years. It's equally as likely that if you have eight lease sales instead of ten, there's going to be less bids, less leases sold, less production, less environmental effects, so the effects are going to be substantially different for that alternative, and the agency just didn't consider that possibility. That's the core of the problem here. Turning to the safety rules issue, the agency never said that based on the quantitative probability analysis alone, a catastrophic spill will not happen, and this court shouldn't put those words into the agency's EIS. They don't exist there. Instead, the agency numerous times points to the reforms because it said, like Judge Wilkins points out, a spill is always low probability, a catastrophic spill, but since Deepwater Horizon happened, the world has changed, and so the agency had to point to all the reforms and say, we've made strides since Deepwater Horizon, so be assured a catastrophic spill is not going to happen again, and it points to the reforms time and time again. We point the sites out on pages 15 and 34 to 35 of our opening brief. It specifically points to the well control rules at JA289, JA634, and JA1018. The agency doesn't cite specifically any of the other reforms in its EIS. Those were the critical pieces of change that the agency was repealing and that it relied on. All right. Your time has expired, so we'll take the matter under advice. Thank you.
judges: Wilkins, Katsas, Jackson